The **CHEROKEE NATION OF OKLAHOMA, Plaintiff,**

v.

The **UNITED STATES, Defendant.**

No. 218–89L.

United States Claims Court.

Oct. 5, 1990.

567

Joe R. Reeder, Washington, D.C., for plaintiff.

Thornton Withers Field, Washington, D.C., with whom was Edward J. Passarelli and Asst. Atty. Gen. Donald A. Carr, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

Plaintiff seeks recovery for damages arising from defendant's breach of numerous alleged fiduciary duties which plaintiff claims arose out of a trust relationship between itself and defendant. This case is before the court on defendant's motion to dismiss on the following grounds: lack of subject matter jurisdiction pursuant to RUSCC 12(b)(1); failure to state a claim upon which relief can be granted, RUSCC 12(b)(4); lack of ripeness of claims; failure to join indispensable parties, RUSCC 19; and alternatively, under the doctrine of *res judicata*, and by operation of 28 U.S.C. § 1500 (1988), which prohibits claim splitting.

## FACTUAL BACKGROUND

On December 29, 1835, defendant and plaintiff entered into a treaty under which plaintiff gave up all of its aboriginal land interests east of the Mississippi River in exchange for substantial territory in the present state of Oklahoma. Treaty of New Echota, December 29, 1835, 7 Stat. 478. In 1906, Congress enacted legislation declaring that the tribal lands of plaintiff were held in trust by defendant for plaintiff's use and benefit. Act of April 26, 1906, ch. 1876, § 27, 34 Stat. 137, 148. In 1908, the United States Secretary of the Interior incorrectly informed both the Governor of Oklahoma and plaintiff that the State of Oklahoma held legal title to the Arkansas Riverbed within the Indian lands. In the 1940's, defendant authorized the construction of the McClellan–Kerr Arkansas River Navigation System (navigation system). Defendant, however, waited until 1957 to start construction of the navigation system which included a dredged channel and a series of dams constructed within a portion of the riverbed. The United States Supreme Court later ruled that the riverbed was included in the lands conveyed to plaintiff by the Treaty of New Echota. *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970).

In its present complaint, plaintiff alleged that defendant breached various fiduciary duties arising out of the tribal lands trust relationship established in 1906. Specifically, plaintiff alleged that defendant breached fiduciary duties by failing to survey plaintiff's lands, by failing to evict trespassers, and by general mismanagement.

Defendant filed a motion to dismiss plaintiff's complaint asserting that under RUSCC 12(b)(1), plaintiff's claims were not within the subject matter jurisdiction of this court, but were within the exclusive jurisdiction of the Indian Claims Commission Act, and as such, were time-barred. Alternatively, defendant contended that plaintiff's complaint was time-barred by operation of 28 U.S.C. § 2501 (1988), which sets forth a six-year statute of limitations. Defendant additionally argued that the claims were not ripe, and that plaintiff had failed to join indispensable parties.

Defendant also moved to dismiss Counts I–V of plaintiff's complaint for failure to state a claim under RUSCC 12(b)(4). In support of this contention, defendant asserted that plaintiff did not cite to specific statutes, regulations, or other authority that would provide a basis for plaintiff to recover monetary damages. Finally, defendant contended that 28 U.S.C. § 1500 (1988), and the general principle of *res judicata* prevent the court from hearing this action, and that plaintiff's action for an accounting is beyond the court's jurisdiction.

Fact-related issues prevent this court from resolving completely defendant's motion to dismiss. Nevertheless, to provide guidance to the parties in anticipation of further litigation, or perhaps settlement, the court will rule on defendant's motion to dismiss but with the caveat that additional material facts may arise in any possible future proceedings that would alter this decision one way or the other. Defendant's claims of *res judicata* and failure to join indispensable parties have fact-related components that may require dismissal of this case or joinder of additional parties. Plaintiff's complaint does not specify which lands are the subject of this case. Identity of the land in question impacts this court's jurisdiction if it is located exclusively with-

in the Arkansas riverbed. Part of the Arkansas riverbed is the subject of a boundary dispute between plaintiff and other Indian tribes, and, accordingly, those tribes must be joined if the land at issue in this case is within the disputed area.

In reviewing the sufficiency of plaintiff's complaint, the issue is not whether plaintiff ultimately will prevail, but whether plaintiff is entitled to offer evidence in support of claims found in the complaint. "[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter [RUSCC 12(b)(1) ], or for failure to state a cause of action [RUSCC 12(b)(4) ]," the court must construe the allegations of the complaint most favorably to the pleader. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Thus, the court cannot dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The court applied this standard and examined each of plaintiff's claims seriatim.

## DISCUSSION

### I. Indian Claims Commission

#### A. *Plaintiff's Claims Are Not Within The Exclusive Jurisdiction Of Indian Claims Commission*

■ According to plaintiff's complaint, the source of the alleged mismanagement was the mistaken 1908 position of the Secretary of Interior that the State of Oklahoma owned the riverbed. Defendant argued that the wrong accrued before 1946, and consequently plaintiff's claims were within the exclusive jurisdiction of the Indian Claims Commission (ICC) and beyond this court's jurisdiction. Plaintiff stressed in its response that the current litigation does not involve the rightful ownership of land. Rather, plaintiff argued, the complaint alleged various breaches of fiduciary duty to protect and manage plaintiff's lands.

Congress set up the ICC in 1946 to provide a damages remedy for all wrongs the United States committed against Indian tribes before 1946. Plaintiffs were required to present claims to the ICC within five years of August 13, 1946, or they would be barred in any court or administrative agency. 25 U.S.C. § 70k (1976). The exclusive jurisdiction of the ICC presents no difficulty in the case at bar because plaintiff may bring claims accruing *after* August 13, 1946 in this court. 28 U.S.C. § 1505 (1988). The claims must arise under the "Constitution, laws or treaties of the United States, or Executive orders of the President, or [be claims] which otherwise would be cognizable in the Claims Court if the claimant were not an Indian tribe." *Id.* The complaint alleges there have been trespassers for the last fifteen years, an alleged violation by defendant of its fiduciary duty to remove trespassers from the tribal lands. Plaintiff's complaint made no claims over the ownership of the riverbed inasmuch as the Supreme Court previously determined ownership of the riverbed in *Choctaw Nation.* Consequently, the only bar the court need consider is the six year statute of limitations set forth at 28 U.S.C. § 2501. This court cannot entertain trespass claims accruing more than six years before plaintiff filed its complaint because those claims are barred by § 2501. The court's jurisdiction over plaintiff's trespass claims extends only to those that first accrued within six years of the filing of the complaint.

#### B. *The Post–1946 Alleged Wrongs Are Not Continuing Wrongs Beginning Before 1946*

■ Alternatively, defendant argued that the court should characterize wrongs committed after 1946 as "continuing wrongs" beginning prior to 1946, and concluded that continuing wrongs arising prior to 1946 would divest the Claims Court of jurisdiction over any post–1946 wrongs. Plaintiff contended the wrongs alleged were not "continuing," and even if they were, plaintiff still could bring an action in the Claims Court for the post–1946 wrongs.

Defendant apparently attempted to apply too aggressively the rule of *Navajo Tribe v. United States*, 586 F.2d 192, 218 Ct.Cl. 11 (1978) *cert. denied*, 441 U.S. 944, 99 S.Ct. 2163, 60 L.Ed.2d 1046 (1979). Under normal circumstances, the "continuing wrong" doctrine acts as a jurisdictional basis for the ICC to hear Indian claims arising from actions occurring after August 13, 1946 which are so similar to pre-August 13, 1946 conduct that they are considered part of a single course of wrongful conduct. *Id.* 586 F.2d at 206 (Nichols, J., concurring and dissenting). Traditionally, plaintiffs have asserted a wrongful course of government conduct in an attempt to link post–1946 conduct to wrongs rightfully redressed by the Indian Claims Commission. By doing so, successful plaintiffs have avoided the applicable statute of limitations. Joining post–1946 conduct to a pre-existing ICC case allowed plaintiffs to benefit from congressional intent to redress, once and for all, Indian claims from time immemorial.[1] Defendant has not cited any case where a court used this judicially-created doctrine to defeat jurisdiction. Rather, courts have applied the doctrine to attach subsequent, related claims to cases properly brought before the ICC.

There are two sources of alleged wrongful conduct in this case: the government's 1908 mistake regarding ownership of the riverbed, resolved in 1970 by the Supreme Court; and the alleged failure to manage plaintiff's lands prudently. Although the pre–1946 mistakes regarding ownership of the riverbed, and the more recent allegations of breach of fiduciary duties both may result in mismanagement of plaintiff's lands, the pre–1946 alleged wrongs are different types of acts from the post–1946 alleged wrongs. This reason alone prevents the court from finding a "continuing wrong" beginning before 1946. Therefore, the court will not dismiss plaintiff's com-

plaint based on exclusive jurisdiction of the ICC over "continuing wrongs."

## II. The Statute Of Limitations

### A. *Claims Accruing Before April 21, 1983 Are Barred By The Statute Of Limitations*

█ The statute of limitations, 28 U.S.C. § 2501, provides that a plaintiff must file its claim within six years of the date when the claim "first accrued" or that claim is barred. Plaintiff in this case filed its complaint April 21, 1989, seeking recovery for claims arising between April 21, 1983 and April 21, 1989. If, however, any of plaintiff's claims "first accrued" more than six years before April 21, 1983, they would be barred absent an applicable tolling exception. Plaintiff admitted it was aware of trespassers on its land prior to April 21, 1983. Accordingly, the claim for failure to remove trespassers may have accrued beyond the statutory period. Plaintiff must present additional facts beyond the present record before the court can decide when plaintiff's claims first accrued.

### B. *Court Cannot Find Plaintiff's Claims For Failure To Remove Trespassers Completely Barred By The Statute Of Limitations*

█ Defendant asserted that plaintiff's claims are time barred by operation of 28 U.S.C. § 2501, because plaintiff knew of the existence of trespassers prior to April 21, 1983. Defendant based the argument on plaintiff's 1981 congressional testimony that trespassers have been on its lands for fifteen years, and letters from plaintiff's General Counsel to the Bureau of Indian Affairs dated March 20, 1973 and July 5, 1974.[2] The testimony and letters demonstrate plaintiff's awareness of trespassers on the land. Plaintiff argued that none of the allegations show that the claim for failure to protect lands from trespassers,

---

1. Judge Nichols warned that this expansive view of the court's jurisdiction would be misunderstood or misapplied. 586 F.2d at 206.

2. In testimony it provided to Congress on December 9, 1981, the Cherokee Nation stated that

"private companies are trespassing on the river with impunity." Plaintiff further testified "We have had to take legal action against these trespassers but the Bureau of Indian Affairs has offered no assistance."

or any other claims, first accrued more than six years before suit was filed.

Whether plaintiff's claims are time-barred turns on the factual determination of the time when such claims "first accrued." In *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir.1988), the United States Court of Appeals for the Federal Circuit stated:

> [F]or the purposes of section 2501, it would appear more accurate to state that a cause of action against the government has "first accrued" only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence.

*Id.* (emphasis in original); *see also Japanese War Notes Claimants Ass'n v. United States*, 373 F.2d 356, 358, 178 Ct.Cl. 630, *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). "However, it is not necessary that the plaintiff obtain a complete understanding of all the facts before the tolling ceases and the statute begins to run." *Hopland Band*, 855 F.2d at 1577.

The mere allegation that trespassers have been on Cherokee lands for more than fifteen years does not necessarily mean plaintiff had notice of all present trespassers fifteen years ago, or that each trespass claim "first accrued" fifteen years ago. This allegation alone is no basis to deny the myriad of claims plaintiff asserted in its complaint. On the other hand, objective facts, specifically plaintiff's 1981 congressional testimony, indicate that plaintiff was aware of the presence of some trespassers beyond the six-year statute of limitation period. Assuming *arguendo* defendant had a duty to remove trespassers, plaintiff's knowledge of a particular trespasser before April 21, 1983 would bar any claim for damages arising from defendant's failure to remove that individual trespasser. Plaintiff's claim would have "first accrued" as to that trespasser before April 21, 1983. However, claims for failure to remove other trespassers who occupied plaintiff's land after April 21, 1983, still are viable.

### C. *Existence Of A Trust Relationship Does Not Toll The Statute Of Limitations*

■ Plaintiff contended that even if some claims were time-barred, various tolling exceptions apply to rescue those claims from the statute of limitations. According to the Federal Circuit, "[t]he general rule is that the statute of limitations 'does not run against a beneficiary in favor of a trustee until the trust is repudiated and the fiduciary relationship is terminated.'" *Hopland Band*, 855 F.2d at 1578. This general rule is not applicable to the facts alleged in this case. Plaintiff here made no allegation that defendant repudiated the trust, but alleged misfeasance or nonfeasance by the defendant as trustee. The rule expressed in *Hopland* is "not applicable to claims for misfeasance or nonfeasance as opposed to claims for recovery of the trust corpus." *Id.* at 1578; *Jones v. United States*, 9 Cl.Ct. 292, 295 (1985), *aff'd*, 801 F.2d 1334 (Fed.Cir.1986), *cert. denied*, 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 495 (1987). In another case involving an allegation of government mismanagement of tribal resources, *Menominee Tribe of Indians v. United States*, 726 F.2d 718, 721–22 (Fed. Cir.), *cert. denied*, 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984), the Court of Appeals reached a similar result and refused to toll the statute of limitations despite the existence of a trust relationship.

Each of plaintiff's claims alleged misfeasance or nonfeasance but there is no dispute here over entitlement to the trust corpus. Count I alleged a breach of fiduciary duty to survey plaintiff's land; failure to protect that land from trespassers; and unlawful exploitation of plaintiff's resources. Counts II and III alleged a breach of duty to issue leases for oil, sand, and mineral exploration; failure to protect plaintiff's resources from unauthorized exploitation by trespassers; failure to manage lands in a manner consistent with tribal and regulatory requirements; and failure to collect royalties. Count IV and Count V made similar allegations about rangeland and timber resources. Count VI alleged defendant made unauthorized use of plaintiff's land. Count VII alleged de-

fendant violated a statutory duty by allowing unauthorized use of land for rights-of-way without notice, consultation, or compensation. Count VIII asked for an accounting, and alleged a failure to inform plaintiff of the state of its financial affairs on a regular basis.

Because these allegations involve misfeasance or nonfeasance, the existence of a trust relationship does not act to toll the statute of limitations. Consequently, any of plaintiff's claims which first accrued before April 21, 1983 (six years prior to the filing date of plaintiff's complaint) are barred by the six-year statute of limitations, unless another exception applies.

### D. Continuing Claim Doctrine Is Not Applicable To Plaintiff's Claims

■ If the court finds claims barred by the statute of limitations, plaintiff seeks application of the "continuing wrong" doctrine to its claims. Plaintiff's terminology is inaccurate; the "continuing wrong" doctrine is applicable only to cases before the ICC. The "continued failure to remove trespassers" alleged by plaintiff is correctly identified as a "continuing claim" under the analysis of *Mitchell v. United States*, 10 Cl.Ct. 63, 65 *modified, on reconsideration*, 10 Cl.Ct. 787 (1986). The *Mitchell* "continuing claim" exception is narrower in scope than the ICC "continuing wrong" doctrine. *See Hart v. United States*, 17 Cl.Ct. 481, 484 (1989), *rev'd.*, 910 F.2d 815 (1990). In reversing the application of a "continuing claim" the Federal Circuit noted that "[e]xceptions cannot be engrafted on the statute of limitations so as to allow claims to be asserted beyond the six-year time limit set forth in Section 2501." *Hart v. United States*, 910 F.2d 815, 817 (Fed. Cir.1990). The Federal Circuit recognized the importance of the statute of limitations and emphasized that the time for bringing a cause of action begins to run "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Kinsey v. United States*, 852 F.2d 556, 557 (Fed.Cir. 1988).

In the present action, the court lacks facts sufficient to render a decision as to when the claims first accrued. The court will not allow defendant to persevere in a continuing wrong. Accordingly, if plaintiff later is able to show that defendant owed a continuous duty, and a breach thereof, plaintiff may recover for the statutory period, but not beyond.

### III. Motion To Dismiss For Failure To State A Claim

#### A. Existence Of A General Trust Relationship Does Not Give Rise To Substantive Claim For Money Damages

■ Defendant argued that many of plaintiffs claims must fail because plaintiff cannot cite specific statutes, treaties, or regulations that are a substantive basis for a waiver of sovereign immunity under the Tucker Act. Defendant moved to dismiss these claims under RUSCC 12(b)(4) for failure to state a claim. Plaintiff argued the court could infer substantive duties from the existence of a trust relationship between plaintiff and defendant. Plaintiff also suggested that the court could construe specific statutes and regulations governing various aspects of the relationship between the parties as a waiver of sovereign immunity. The court disagrees. To state a claim within the court's jurisdiction, plaintiff must identify a particular statute or regulation imposing a duty on defendant, and a right to money damages for breach of that duty. *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). The Supreme Court has determined that, for a trust to arise, the government must play a "pervasive role" and that the combination of statutes and regulations show congressional intent to create a trust relationship. *Mitchell v. United States*, 463 U.S. 206, 225, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983).

The United States Supreme Court acknowledged that a trust relationship could exist between plaintiff and defendant. *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 627, 90 S.Ct. 1328, 1332, 25 L.Ed.2d 615 (1970). "Congress provided for the

disposition [by allotment] of all petitioners lands with the provision that any remaining tribal property 'be held in trust by the United States for the use and benefit of the Indians.'" *Id.* at 627, 90 S.Ct. at 1332, *quoting* Act of April 26, 1906, § 27, 34 Stat. 148. However, the existence of a trust relationship does not mean that any and every claim by the Indians "necessarily states a proper claim for breach of the trust." *Pawnee v. United States,* 830 F.2d 187, 191 (Fed.Cir.1987), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). Similarly, the Supreme Court has determined that allegations of breach of a general trust relationship do not create a right to money damages within the meaning of the Tucker Act, and do not state a claim within this court's jurisdiction. *United States v. Mitchell,* 445 U.S. 535, 542–44, 100 S.Ct. 1349, 1353–54, 63 L.Ed.2d 607 (1980) (*Mitchell I*).

The general relationship between the United States and the Indian tribes is not comparable to a private trust relationship. *Eastern Band of Cherokee Indians v. United States,* 16 Cl.Ct. 75, 78 (1988). "When the source of substantive law intended and recognized only the general, or bare, trust relationship, fiduciary obligations applicable to private trustees are not imposed on the United States." *Montana Bank of Circle, N.A. v. United States,* 7 Cl.Ct. 601, 613–14 (1985). Rather, the general relationship between Indian tribes and defendant traditionally has been understood to be in the nature of a guardian-ward relationship. *Klamath & Moadoc Tribes of Indians v. United States,* 296 U.S. 244, 254, 56 S.Ct. 212, 217, 80 L.Ed. 202 (1935); *United States v. Kagama,* 118 U.S. 375, 383, 6 S.Ct. 1109, 1113, 30 L.Ed. 228 (1886).[3] "A guardianship is not a trust." Restatement (Second) of Trusts § 7 (1959). "The duties of a trustee are more intensive than the duties of some other fiduciaries." *Id.* § 2 comment b.

Furthermore, a guardian-ward relationship implies that, at some point, the ward will begin to take responsibility for handling its own affairs. By contrast, a private trust relationship is a static relationship, with all encompassing duties forever on the trustee.

The Supreme Court recognized distinctive trust obligations upon the government in its dealings with Indian tribes in *Nevada v. United States,* 463 U.S. 110, 127–28, 103 S.Ct. 2906, 2917, 77 L.Ed.2d 509 (1983). Later, the Claims Court applied *Nevada,* and noted that "the provisions relating to private trustees and fiduciaries, while useful as analogies, cannot be regarded as finally dispositive in a government-Indian/trustee-fiduciary relationship." *Begay v. United States,* 16 Cl.Ct. 107, 127 n. 17 (1987). Congress never intended the government to act as trustee over every aspect of Indian life in "a pervasive day-to-day relationship [where Government] duties would be monitored by the court, and whose actions or inactions would subject the government to damage claims." Nor should the court, by reason of the separation of powers doctrine, micromanage the programs and activities of an Executive Branch agency. *Id.*

Over the years, Congress has enacted numerous statutes for the benefit of native Americans, some of which fairly are characterized as placing trust responsibilities on the government. Other statutes can be characterized as only guardian in nature because they clearly contemplate an active decision-making role by the tribe or by individual Indians. Statutes and regulations defining a general relationship between plaintiff and defendant should be construed in the latter context. On the other hand, with respect to a specific corpus such as Indian mineral resources, plaintiff may cite statutes and regulations that prescribe a higher duty than the typical

---

3. The Supreme Court has characterized Indian tribes as "wards of the nation" rather than trust beneficiaries. *United States v. Kagama,* 118 U.S. 375, 383, 6 S.Ct. 1109, 1113, 30 L.Ed. 228 (1886). In 1935, the Supreme Court, in describing the same relationship as a guardian-ward relationship, stated that "[t]he relation between

them is different from that existing between individuals whether dealing at arm's length, as trustees and beneficiaries, or otherwise." *Klamath & Moadoc Tribes of Indians v. United States,* 296 U.S. 244, 254, 56 S.Ct. 212, 217, 80 L.Ed. 202 (1935).

guardian-ward relationship. *Pawnee*, 830 F.2d at 189–90.

Plaintiff, the Cherokee Nation, is one of the "five civilized tribes" that relocated in 1832 to the Indian Territory which today comprises the state of Oklahoma. These five tribes traditionally have assumed a greater role in managing their own affairs. Before statehood, plaintiff established and maintained schools, court systems, as well as other governmental functions.[4] Even after the federal government began performing these functions, Congress continued to recognize that the Cherokee Nation largely had integrated into white society and was in an excellent position to manage its own affairs. Acknowledging this amalgamation, Congress exempted the five civilized tribes from many of the laws enacted to protect Indian interests. Because of the legislative and historical background, this court must examine plaintiff's claims in accordance with congressional intent. The court must interpret only those statutes and regulations which apply to the Cherokee Nation in determining whether the government breached any duty owed to it.

B. *Cherokee Lands In General*

1. No Substantive Duty Owed By Defendant To Remove Casual Trespassers

■ Plaintiff asserted that defendant breached a fiduciary duty to remove casual trespassers from its lands. The term casual trespassers refers to trespassers on plaintiff's lands in general. Defendant argued there is no statute or regulation stating a fiduciary duty to protect trust lands from casual trespassers, and that although prosecution of trespassers is within the general discretion of the Justice Department, plaintiff was more than capable of instituting its own litigation to remove them.

---

**4.** A. Debo, *A History of the Indians of the United States,* 97–98, 112–13 (1970).

**5.** Plaintiff argued that the government should prosecute trespassers pursuant to Article 6 of the 1835 Treaty between the United States and the Cherokees. The Article provides: "The Cherokees ... shall also be protected against interruption and intrusion from citizens of the

Article 27 of the July 19, 1866 Treaty with the Cherokee Indians provides:

> [A]ll persons not in the military service of the United States, not citizens of the Cherokee nation, are to be prohibited from coming into the Cherokee nation, or remaining in the same, except as herein otherwise provided; and it is the duty of the United States Indian agent for the Cherokees to have such persons, not lawfully residing or sojourning therein, removed from the nation, as they now are, or hereafter may be, required by Indian intercourse laws of the United States.

14 Stat. 799, 806. The treaty refers the court to the Indian anti-intercourse laws of the United States in order to determine whether a duty exists. Plaintiff cites 25 U.S.C. § 180 (1982), which states "[e]very person who makes a settlement on any lands belonging, secured, or granted by treaty with the United States to any Indian tribe, or surveys or attempts to survey such lands, or to designate any of the boundaries by marking trees, or otherwise, is liable to a penalty of $1,000." Section 180 further provides "[t]he President *may*, moreover, take such measures and employ such military force as he may judge necessary to remove any such person from the lands." *Id.* (emphasis added).

The specific intent of 25 U.S.C. § 180, is directed at preventing unlawful occupation or homesteading of Indian lands by non-Indians. Application of § 180 to casual trespassers is discretionary. The statute creates a cause of action against trespassers and provides for a fine, but does not require that defendant bring the cause of action. Rather, the statute indicates defendant "may" take such measures "as he may judge necessary." The language leaves any action to defendant's discretion.[5] Even though the treaty and statute both

United States, who may attempt to settle in the country without their consent; and all such persons shall be removed ... by order of the President of the United States." 7 Stat. 478, 481. This section of the treaty clearly is directed at homesteaders and unlawful settlers on Indian lands. The terms of the treaty likewise are inapplicable to casual trespassers.

575

may be read to suggest a prohibition on casual trespassers, action by the President of the United States acting through the Attorney General and the Secretary of the Interior remains discretionary. Accordingly, the court cannot construe the treaty and statute as imposing a substantive duty on defendant without other statutes or regulations that create a higher duty to protect plaintiff's lands. The court also notes that the Tribe could exercise sovereignty by acting against trespassers, as it has done in the past.[6] Therefore, the language of 25 U.S.C. § 180, places no substantive "trust-like" duty on defendant to remove casual trespassers from plaintiff's lands.

The Supreme Court previously has recognized the government's discretion in acting against trespassers. "It must be remembered that the Secretary was traditionally given wide discretion in the handling of Indian affairs and that discretion would seldom be more necessary than in determining when to institute legal proceedings." *Creek Nation v. United States,* 318 U.S. 629, 639, 63 S.Ct. 784, 789, 87 L.Ed. 1046 (1943). In construing § 11 of the Act of 1906, 34 Stat. 137, upon which plaintiff in this case also relied, the Supreme Court stated "the Secretary was surely entitled to discretion as to which trespass actions he might consider worth bringing." *Id.* at 638, 63 S.Ct. at 789. The Court determined the Seminole and Creek Treaties of 1866 "did not obligate the United States to compensate the tribes for encroachments." *Creek Nation,* 318 U.S. at 633–34, 63 S.Ct. at 786–87. The Seminole and Creek Treaties are similar to plaintiff's treaty.

*United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*), does not compel this court to find a fiduciary duty to remove casual trespassers from plaintiff's lands. Defendant, in this case, does not exercise *Mitchell II* type control over plaintiff's lands in general. There are no applicable regulations, similar to, for instance, 25 C.F.R. Part 163 (1989), that detail the scope of federal supervision over plaintiff's lands. Defendant

is not charged with protecting and generating income from a specific corpus. Removing casual trespassers is a discretionary responsibility not subject to the higher standard applied to Indian timber, oil, gas, or mineral lands. Accordingly, this court cannot conclude that 25 U.S.C. § 180, creates a substantive duty to remove casual trespassers with a corresponding right to money damages for breach.

Plaintiff also argued that 25 C.F.R. § 163.22, imposes a duty on defendant to remove casual trespassers. The regulations state "[t]he secretary will provide for timely action on any reports of trespass on Indian trust lands including pending Native allotments." 25 C.F.R. § 163.22(e). Part 163 is a portion of a pervasive scheme of regulation limited to Indian forest lands, and does not apply to a discussion of a general duty to remove casual trespassers from plaintiff's lands.

This court finds no substantive duty to remove casual trespassers under 25 U.S.C. § 180, in the absence of statutes or regulations imposing a higher fiduciary duty. Accordingly, the court concludes that with respect to casual trespassers on plaintiff's land in general, plaintiff did not state a claim under RUSCC 12(b)(4). The court will discuss separately the issue of whether defendant owes a substantive duty to remove trespassers from plaintiff's mineral estate, grazing lands, and timber lands.

2. There Is No General Duty To Survey Plaintiff's Lands

◼ Plaintiff alleged that defendant breached a duty to conduct surveys of plaintiff's land, making it impossible for plaintiff to prosecute trespassers. Defendant, citing 25 U.S.C. § 176 (1982), argued that it need conduct surveys only when necessary, is not required to initiate surveys, and that plaintiff may conduct its own surveys. Defendant bases these contentions on 25 U.S.C. § 176 (1982) which states:

**6.** In testimony provided to Congress, the Tribe stated that "the other trespassers can and are

being sued."

Whenever it becomes necessary to survey any Indian or other reservations, or any lands, the same shall be surveyed under the direction and control of the Bureau of Land Management, and as nearly as may be in conformity to the rules and regulations under which other public lands are surveyed.

*Id.* The plain language of this statute gives defendant at least as much discretion as that conferred by 25 U.S.C. § 180, and most certainly does not prohibit plaintiff from making its own surveys. Most importantly, the survey section is not part of a comprehensive statutory scheme sufficient to impose a *Mitchell II* type fiduciary relationship with respect to plaintiff's lands. Defendant has no affirmative duty to exercise discretion and survey plaintiff's lands. Plaintiff's claim does not give rise to money damages under the statute and thus is not within the jurisdiction of this court.

### C. *Mineral Lands Specifically*

1. Plaintiff Has Stated A Claim For Defendant's Alleged Failure To Remove Trespassers From Plaintiff's Mineral Estate

■ Plaintiff alleged a breach of fiduciary duty to remove trespassers from plaintiff's oil, gas, and other mineral lands. Plaintiff further contended that the presence of these trespassers prevented commercial entities from entering into leases with plaintiff, and interfered with lawful lessees operating on plaintiff's land. The trespassers, according to plaintiff, issued conflicting leases which prevented resource development and caused unlawful drainage of these resources. Defendant responded that it has no duty to remove trespassers from any of plaintiff's lands because such actions lie within the discretion of the Secretary of the Interior.

This court previously found that 25 U.S.C. § 180, imposed no substantive duty on defendant to remove casual trespassers from plaintiff's lands in general. That analysis of 25 U.S.C. § 180, applies equally here, but defendant's role in managing plaintiff's mineral estate is greater than its role in managing plaintiff's lands in general. *Pawnee,* 830 F.2d at 189–90. The Federal Circuit made this determination citing the congressional mandate in 30 U.S.C. § 1701(a)(4) (1982), which states "the Secretary should aggressively carry out his trust responsibility in the administration of Indian oil and gas." *Pawnee,* 830 F.2d at 190. The Federal Circuit also determined "the United States has a general fiduciary obligation toward the Indians with respect to the management of ... oil and gas leases." *Id.* at 190. However, following the *Pawnee* interpretation of *Mitchell II,* which binds this court, the existence of a "general fiduciary relationship does *not* mean that any and every claim by the Indian lessor necessarily states a proper claim for breach of the trust." *Id.* at 191 (emphasis in original). Consequently, it does not necessarily follow from the existence of a general fiduciary relationship that plaintiff has stated a claim for defendant's alleged failure to remove trespassers from plaintiff's mineral estate.

In *Pawnee,* plaintiff asserted claims for failure properly to make and administer leases and collect royalties, rather than for failure to remove trespassers. Nevertheless, the language of plaintiff's complaint and the general language of the statutes in question (25 U.S.C. § 396a–396g (1982), 30 U.S.C. §§ 1701–1736 (1982), and 25 C.F.R. §§ 211, 213 (1989)), might satisfy the requirements of *Pawnee.* In order to administer plaintiff's mineral estate and collect royalties, the government must remove trespassers who take oil or gas illegally.[7]

---

7. This court, like its predecessor the United States Court of Claims, has no jurisdiction to issue injunctions compelling the United States to remove trespassers from Indian lands. *See Hoopa Valley Tribe v. United States,* 596 F.2d 435, 443, 219 Ct.Cl. 492 (1889) *citing United States v. Jones,* 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1889). Claims Court general jurisdiction does not include actions in equity. *See Kla-*

*math & Modoc Tribes & Yahooskin Band of Snake Indians v. United States,* 174 Ct.Cl. 483, 487 (1966). The Claims Court does have jurisdiction to grant judgment when a fiduciary relationship exists under the standards of *Mitchell II* and plaintiff has proved a proper claim for breach of trust. Indian tribes have the same rights to sue in the Claims Court as granted to others under the Tucker Act. 28 U.S.C. § 1505.

At trial, should the case proceed so far, plaintiff must show with particularity the statutes and regulations applicable to its claim for failure to remove trespassers from the mineral estate and how defendant failed to comply with those requirements.

2. Plaintiff's Claim For Defendant's Alleged Failure To Issue Mineral Leases

■ Plaintiff alleged defendant did not respond to third party requests for mineral leases. Defendant countered there is no affirmative duty to issue leases. Defendant, citing 25 U.S.C. § 396a and 25 C.F.R. § 211.2 (1989), claimed that plaintiff is the leasing authority, subject only to defendant's approval. Defendant based its contentions on the distinction between the responsibilities owed before leasing versus those owed once leasing has occurred.

Plaintiff cites *Pawnee* to support its claim for failure to issue mineral leases. The Federal Circuit, citing 25 U.S.C. § 396, noted that the Secretary of the Interior is "at the center of the leasing of Indian mineral lands." *Pawnee*, 830 F.2d at 189. The Secretary of the Interior is charged under 30 U.S.C. § 1701(a)(4), with "aggressively" carrying out "his trust responsibility in the administration of Indian oil and gas." *Pawnee*, 830 F.2d at 190. Defendant's "aggressive" actions are, however, at the "center" of the leasing process, not the forefront. "Indian tribes ... may ... lease their land for mining purposes," subject only to the approval of the Secretary of the Interior. 25 C.F.R. § 211.2 (1989). Accordingly, it is possible that had defendant entered into leases on behalf of the Indian tribe, plaintiff still may have claimed breach of the fiduciary duty. History has taught that tribes oftentimes file suit against the Secretary of the Interior for leasing lands even though the tribe previously had approved, and even requested the lease, or leasing policy.

The existence of a general fiduciary duty "does *not* mean ... that every Government action disliked by the Indians is automatically a violation of that trust." *Pawnee*, 830 F.2d at 190 n. 5 (emphasis in original). Nevertheless, comparing the language in plaintiff's complaint with the statutes and regulations cited, the court finds that plaintiff ostensibly has met the requirements of *Pawnee*. Thus, at trial, plaintiff must show with particularity which statutes and regulations apply, and how defendant failed to follow the statutory requirements.

### D. *Farming And Grazing Lands*

Plaintiff's allegations of mismanagement of farming and grazing lands allege simply that defendant failed to evict trespassers conducting agricultural activity, and failed to issue grazing and farming leases.

1. Plaintiff Did Not State A Claim For Failure To Remove Trespassers From Farming And Grazing Lands

■ Plaintiff alleged that defendant was under a substantive duty to issue farming and grazing leases, and to remove farming and grazing trespassers from its land. Plaintiff's complaint relies extensively on 25 C.F.R. Part 166 (1989) as a source of these alleged duties, as well as 25 C.F.R. Part 162 (1989) and 25 U.S.C. § 397 (1982). Defendant argued that 25 C.F.R. Part 166 was not applicable to plaintiff's rangeland. Plaintiff apparently conceded that 25 C.F.R. Part 166 was not applicable because its brief in opposition properly ceased to rely on that regulation and relied only on 25 C.F.R. Part 162 and 25 U.S.C. § 397. Plaintiff's lands do not fall under the management scheme for grazing lands found in 25 C.F.R. Part 166 because that section regulates grazing on range units created under 25 C.F.R. § 166.5. Range units described by this regulation do not apply to plaintiff's lands. Instead, plaintiff's claims are subject to the leasing provisions in 25 C.F.R. Part 162 rather than Part 166. *See* 25 C.F.R. § 166.4. Proper analysis requires the court to determine whether 25 C.F.R. Part 162 and 25 U.S.C. § 397 are pervasive and thus sufficient to find the fiduciary relationship contemplated by *Mitchell II* and *Pawnee*.

25 U.S.C. § 397 vests significant power over grazing leases in the tribe. The statute provides that land "may be leased by authority of the council speaking for such Indians ... subject to the approval of the Secretary." *Id.* This language falls short

of giving defendant a pervasive role in managing plaintiff's farming and grazing lands. The statute recognizes that the Indians may enter into leases subject only to oversight supervision by the Secretary of the Interior to prevent exploitation by lessees. Likewise, Part 162 does not establish a comprehensive regulatory scheme that is as pervasive as the statutes covering mineral lands. For example, the Secretary has limited authority to grant leases as defined by 25 C.F.R. § 162.2 (1989). That section specifically lists the persons and parties on whose behalf the Secretary may grant leases, none of whom are a tribal authority such as the plaintiff. *Id.* Furthermore, 25 C.F.R. § 162.3(4) states that "tribes or tribal corporations" also may grant leases and § 162.6(a) provides that "[l]eases of individually owned land or tribal land may be negotiated by those owners or their representatives who may execute leases pursuant to 162.3." Other sections limit the Secretary's powers under 25 C.F.R. Part 162. For example, the Secretary "may negotiate leases when in his judgment the fair annual rental value can thus be obtained." 25 C.F.R. § 162.6(c). Section 162.7 provides that "prior to granting a lease or permit as authorized under 162.2, the Secretary shall advertise the land for lease." Thus, the substantive provisions are contingent on defendant having the authority prescribed in § 162.2.

This court concludes that 25 U.S.C. § 397 and 25 C.F.R. Part 162 are not sufficient to create a fiduciary relationship between plaintiff and defendant. The regulatory scheme set forth in 25 C.F.R. part 162 acknowledges the tribe's sovereign power and envisions that the tribe will assume increasing responsibility for leasing lands used for agricultural purposes. Part 162 also recognizes increasing responsibility assumed by individual Indians who lease their allotted lands. This formula differs drastically from the pervasive nature of the statutes and regulations governing management of oil, gas, and timber resources under which defendant assumes full responsibility. As previously discussed, 25 U.S.C. § 180 (the provision regarding trespassers) is an insufficient basis

upon which to find a waiver of sovereign immunity regarding plaintiff's range and farmlands. The statutes and regulations that apply to plaintiff's agricultural lands are insufficient to create the fiduciary relationship required by *Pawnee.* In sum, applying the standards of *Mitchell II* and *Pawnee,* the court is unable to find any statute or regulation or combinations thereof that create a fiduciary relationship between defendant and plaintiff over plaintiff's agricultural lands. Plaintiff has not stated a claim within this court's jurisdiction for failure to remove trespassers from its range and farm lands.

### 2. Plaintiff Did Not State A Claim For Failure To Issue Leases For Farming And Grazing

As discussed in the preceding section, the court is unable to find a *Mitchell II* or *Pawnee* type statutory and regulatory scheme sufficient to create a fiduciary relationship between defendant and plaintiff with respect to plaintiff's farming and grazing lands. The jurisdiction of this court does not support plaintiff's claims for failure to issue leases on farming and grazing lands.

### E. *Timber Lands*

#### 1. Timber Management Scheme Is Inapplicable To Plaintiff

Plaintiff relied on 25 U.S.C. §§ 406, 407, and 466, as well as 25 C.F.R. Part 163 to allege that defendant breached its duty by failing to: 1) properly manage forest resources; 2) properly sell forest products; 3) require reforestation of the land after harvesting; and 4) prosecute trespassers. Defendant argued that 25 U.S.C. §§ 406, 407, and 466 were inapplicable to the Cherokee as one of the Five Civilized Tribes. Congress originally enacted Sections 406 and 407 as sections 7 and 8 of the Act of June 25, 1910, ch. 431, 36 Stat. 855, 857. Section 33 the 1910 Act expressly made the Act inapplicable to the Five Civilized Tribes, including plaintiff. 36 Stat. 863; 25 U.S.C. § 353. Defendant is correct, the statutes specifically are inapplicable to plaintiff. Section 6 of the Indian Reorganization Act of June 18, 1834, ch.

576, 48 Stat. 984, 986 (25 U.S.C. § 466) also is not applicable to plaintiff, 25 U.S.C. §§ 473, 503. Oklahoma Indian tribes, including plaintiff, must adopt a charter to secure the rights and privileges of the 1934 Act, including § 466.[8] *See* 25 U.S.C. § 503 (1982). Plaintiff never adopted such a charter. *Wheeler v. United States Department of Interior, Bureau of Indian Affairs,* 811 F.2d 549, 550 (10th Cir.1987).

This court finds the timber management scheme inapplicable to plaintiff's timber lands. This conclusion is buttressed by plaintiff's failure to contest defendant's motion to dismiss that count of the complaint. Plaintiff's failure to contest is a sufficient basis to grant defendant's motion. *Prindle v. United States,* 5 Cl.Ct. 493, 495 n. 7 (1984) (plaintiff's failure to reassert estoppel claim in its opposition to defendant's motion constituted an abandonment of that claim).

## IV. Ripeness

■ Defendant argued that under *Hopi Tribe v. United States,* 20 Cl.Ct. 782 (1989), plaintiff's claims were not ripe because defendant had refused no demands made by plaintiff. Plaintiff countered that the reasoning of *Hopi* undercut defendant's statute of limitation arguments. In *Hopi,* defendant raised substantially the same 28 U.S.C. § 2501 statute of limitations argument discussed *supra,* p. 570. The Claims Court in *Hopi* rejected defendant's argument, stating that a cause of action can accrue against a trustee only "when the trustee definitely and unequivocally repudiates the trust." *Hopi,* at 783. Because plaintiff did not allege repudiation of the trust, the claim had not accrued and, thus, was not ripe. *Id.* at 784.

This court declines to follow the *Hopi* rationale in these circumstances. The rule that a claim does not accrue until a demand is made and the trust repudiated is inapplicable in cases of alleged misfeasance or nonfeasance such as the present case. *Hopland Band,* 855 F.2d at 1578; *see also Jones,* 9 Cl.Ct. at 295. Similarly, in *Menominee Tribe,* 726 F.2d at 722, the Federal Circuit refused to say that a claim had not accrued even though defendant had not repudiated the trust relationship. This court follows the Federal Circuit's analysis and declines to apply the view articulated in *Hopi.* Plaintiff's claims are ripe.

## V. Indispensable Parties

■ Defendant contended this action should be dismissed under RUSCC 19(a) and (b) for failure to join third-party trespassers as indispensable parties. Defendant argued that the United States cannot be liable with respect to a property interest unless the trespassing parties are adjudicated as having no title to the property in question. Thus, alleged trespassers would be indispensable parties. Plaintiff failed to provide the trespassers' identities therefore, according to defendant, these alleged trespassers cannot be made parties to the action.[9] Defendant also argued that any adverse title determinations could implicate property interests of third-party trespassers, subjecting the government to multiple law suits. Plaintiff contended that the absentee interests have no direct relation to the alleged breach of fiduciary duties.

Some of plaintiff's claims do not involve trespass, *i.e.* a breach of duty to issue mineral leases and follow mineral leasing procedures, the failure to collect royalties, and the failure to reforest timber lands. Proof of the presence of trespassers is not necessary for these claims. Thus, these

---

8. The Oklahoma Indians were excluded from the provisions of the 1934 Indian Reorganization Act because of the intervention of Senator Thomas of Oklahoma. Senator Thomas argued that the philosophy behind the Indian Reorganization Act did not apply in Oklahoma where the Indians generally assimilated into the culture of the state. *See* 78 Cong.Rec. at 11126 (Remarks of Senator Thomas). The cultural and political sophistication of the Five Civilized Tribes of Oklahoma buttresses the conclusion that the

timber management scheme does not apply to plaintiff.

9. A later determination that some of the alleged trespassers are "indispensable" parties would raise serious jurisdictional issues as to those claims, since this court does not have jurisdiction to adjudicate title disputes between plaintiff and an alleged third-party trespasser.

claims need not be dismissed, even if the court ultimately finds that the alleged trespassers are indispensable to the trespass related claims. *See Tick v. Cohen,* 787 F.2d 1490, 1495 (11th Cir.1986) (dismissing count where joinder of indispensable parties would destroy diversity jurisdiction, but retaining counts in which absentees had no interest).

Plaintiff asserted other claims which require proving the presence of trespassers, but failed to identify the alleged trespassers making it impossible to join them at this stage of the litigation. This court must determine whether the proceedings can continue without the alleged trespassers. Addressing this issue, the Supreme Court held "a court does not know whether a particular person is 'indispensable' until it has examined the situation to determine whether it can proceed without him." *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 119, 88 S.Ct. 733, 743, 19 L.Ed.2d 936 (1968). The legitimacy of title of the alleged trespassers versus that of plaintiff may indeed become a critical issue at a later stage of the proceedings, at which point some or all of the alleged trespassers would be "indispensable" parties. The present record does not show that alleged invasions of plaintiff's lands were limited to areas where the title is subject to dispute. Actions must be allowed to proceed until parties are proven "indispensable." *Francis Oil & Gas, Inc. v. Exxon Corp.,* 661 F.2d 873, 879–80 (10th Cir.1981). At this stage of the litigation, the alleged trespassers have not been identified specifically through appropriate discovery.[10] The court can determine "indispensability" after the parties identify the trespassers, and show title of the occupied lands to be in dispute. Until then, this case may proceed without the alleged trespassers. If necessary, this court will make a determination of "indispensability" at the appropriate time and upon proper motion.

## VI. Claim Splitting And The Doctrine Of Res Judicata

### 1. Plaintiff's Claims In General Are Not Barred By 28 U.S.C. § 1500

 Defendant alleged that all claims related to and arising out of the construction of the Arkansas River Navigation System are barred because plaintiff already has prosecuted such claims in United States District Court. *See Cherokee Nation of Oklahoma v. United States,* No. 83–306–C, slip op. (E.D.Okla. Dec. 22, 1987) (unpublished order granting defendant's summary judgment motion). Defendant argued that claims in this action overlap with claims in the prior action and cannot be considered by this court because the court "shall not have jurisdiction" of any claim plaintiff has pending in any other court. 28 U.S.C. § 1500. Plaintiff alleged that the claims set forth in the complaint are entirely separate from the claims raised in the district court action.

The term "claim" as used in 28 U.S.C. § 1500 is "defined by the operative facts alleged, not the legal theories raised." *Johns–Manville Corp. v. United States,* 855 F.2d 1556, 1563 (Fed.Cir.1988), *cert. denied,* 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989). The Federal Circuit stated that "[c]laims are the same where they arise from the same operative facts even if the operative facts support different legal theories which cannot all be brought in one court." *Id.* at 1567; *Beauregard Parish Police Jury v. United States,* 16 Cl.Ct. 344, 345 (1989). Plaintiff's claims before the Oklahoma district court were limited to injuries sustained from construction of the Arkansas River Navigation System. The alleged facts in this case include claims unrelated to construction of the navigation system, and activity on lands beyond the riverbed area.[11] The

---

**10.** Plaintiff was not required to identify the alleged trespassers in its complaint. A pleading need only give to the other side fair notice of the claim asserted. *Tester Corp. v. United States,* 1 Cl.Ct. 370, 377 (1982). Identification of alleged trespassers is a proper object for discovery.

**11.** Plaintiff argued that the alleged breach of statutory and fiduciary duties included failure to survey lands, failure to evict trespassers, and failure to account for the presence of the unlawful intruders. These alleged omissions are not related to the construction of the Navigation System.

claims might be barred by *res judicata,* but not by 28 U.S.C. § 1500 because that Act divests this court of its usual jurisdiction only if the claim is pending in any other court.

2. Plaintiff's Claims Are Not Barred By The Doctrine Of *Res Judicata* Except To The Extent They Encompass The Area Subject To Defendant's Dominant Servitude

In the 1983 district court action, plaintiff alleged two theories of recovery. The first was that construction of the navigation system by the United States was a Fifth Amendment taking of the plaintiff's riverbed interests requiring just compensation. The second theory alleged violation of the fair and honorable dealings clause under the Indian Claims Commission Act, ch. 959, 60 stat. 1049, 1050 (1946); 25 U.S.C. § 70a (repealed). Both theories of recovery sought "compensation for the United States' exercise of its navigational servitude in the construction of the McClellan–Kerr Navigational Project." *Cherokee Nation,* No. 83–306–C at 4.

The United States District Court for the Eastern District of Oklahoma and the United States Court of Appeals for the Tenth Circuit held for the plaintiff on its first theory. The Supreme Court reversed, reasoning that the United States had not waived its navigable servitude in the Arkansas River. The Supreme Court held that the navigable servitude "gives to the Federal Government a 'dominant servitude' which extends to the entire stream and the stream bed below the ordinary high water mark." *United States v. Cherokee Nation of Oklahoma,* 480 U.S. 700, 704, 107 S.Ct. 1487, 1490, 94 L.Ed.2d 704 (1987). The Court concluded:

The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment[,] but from the lawful exercise of a power to which the interests of riparian owners have always been subject.

*Id.* The court entered summary judgment against the Cherokee Nation, and the second theory presently is on appeal to the Tenth Circuit. Both theories in the 1983 district court action were brought under jurisdiction conferred by H.R. 2329, 97th Cong., 2d Sess. (1982), which states:

[J]urisdiction is hereby conferred upon the United States Court of Claims, or upon the United States District Court for the Eastern District of Oklahoma, to hear, determine, and render judgment, ... on any claim which the Cherokee Nation of Oklahoma may have against the United States for any and all damages to Cherokee tribal assets *related to and arising from construction of the Arkansas River Navigation System,* including, but not limited to, the value of sand, gravel, coal, and other resources taken,

An Act, Pub.L. No. 97–385, 96 Stat.1944, (1982) (emphasis added). Plaintiff's present action seeks recovery based on a claim that the government breached a fiduciary duty to protect and manage tribal resources.

The complaint in this case cites trespassers on the riverbed, but gives no indication that plaintiff's complaint is limited geographically to the portion of the riverbed where defendant exercises its dominant servitude. The doctrine of *res judicata* invoked by the prior adjudication bars only those claims that arose in connection with defendant's exercise of its navigable servitude. All claims beyond that geographic area are not barred. Defendant, however, must identify specifically any overlapping claims before the court can pare down the broadly-plead allegations by dismissal on the grounds of *res judicata.*

3. Plaintiff's Claims Against Other Land Occupied By Defendant Are Not Barred

Defendant contended that Count VI of plaintiff's complaint should be barred under the same theories discussed above because defendant has occupied the riverbed lands "for its own purpose and for the public use." The allegations in Count VI, however, do not mention lands occupied by defendant pursuant to its navigable servi-

tude. Since Count VI is not limited to the portion of the riverbed where the defendant exercises its navigable servitude, but rather encompasses a broad area, count VI likewise is not barred by any of the theories raised by the defendant.

### VII. Plaintiff's Request For An Accounting

■ Plaintiff requested that the court direct an accounting of all Tribal matters, including the accounts relating to oil and gas, mineral, timber, and farming and grazing leases. Defendant argued that an action for an accounting is an equitable claim. Therefore, because the Claims Court does not have jurisdiction over actions in equity and can award only damages, that claim must be dismissed. *Glidden Co. v. Zdanok*, 370 U.S. 530, 557, 82 S.Ct. 1459, 1476, 8 L.Ed.2d 671 (1962); *Klamath & Modoc Tribes*, 174 Ct.Cl. at 487–88.

On the whole, defendant's argument is correct. Until plaintiff establishes the liability of defendant, an accounting action takes the form of an independent equitable action beyond the jurisdiction of this court. *See, e.g., Klamath*, 174 Ct.Cl. at 490–91. However, the court may order an accounting in conjunction with its jurisdiction to render a money judgment. *Id.* at 490. Plaintiff's request for an accounting (Count VII) is deferred until such time as it is properly raised after the court determines defendant's liability.

### CONCLUSION

Defendant's motion to dismiss under RUSCC 12(b)(1) is denied. On the basis of the present record, the court cannot conclude that plaintiff's claims are time barred by operation of the statute of limitations.

The court grants defendant's motion to dismiss for failure to state a claim with respect to plaintiff's claims for: (1) failure to evict casual trespassers from plaintiff's lands in general and failure to survey those lands; (2) failure to remove trespassers from plaintiff's farm and range lands and failure to issue farming and grazing leases; and (3) failure to manage plaintiff's timber lands. The motion to dismiss is denied

with respect to plaintiff's claims for the alleged failure to remove trespassers from, and issue leases on its mineral lands.

Plaintiff's other claims have accrued and are ripe for adjudication before this court. Defendant's motion to dismiss on the grounds of failure to join indispensable parties is denied. Defendant's motion to dismiss on the basis of 28 U.S.C. § 1500, likewise is denied, except with regard to any claims which subsequently are shown to have arisen out of the construction of the Arkansas River Navigation System. Defendant's motion to dismiss on the basis of *res judicata* is denied, except for claims arising on land subject to defendant's navigable servitude. The court will not order an accounting unless plaintiff successfully establishes defendant's liability, and the parties are unable to agree to damages.

IT IS SO ORDERED.